883 So.2d 465 (2004)
Betty Jo DRURY, Plaintiff-Appellee
v.
Kurt Donald DRURY, Defendant-Appellant.
No. 38,951-CA.
Court of Appeal of Louisiana, Second Circuit.
September 22, 2004.
*466 William B. King, Shreveport, for Appellant.
Katherine Clark Dorroh, for Appellee.
Before BROWN, DREW and LOLLEY, JJ.
DREW, J.
Kurt Drury appeals a judgment awarding Betty Jo Drury $600.00 per month in permanent periodic spousal support. We affirm.

FACTS
Betty Jo Drury ("Betty") and Kurt Drury ("Kurt") were married on March 5, 1973. The couple eventually established a matrimonial domicile in Shreveport, Louisiana, where they resided when these proceedings commenced. The couple's only child, Marci Brooks, is of the age of majority. On December 24, 2000, Donald moved out of the matrimonial domicile to pursue a relationship with a woman he had met on the internet. On February 22, 2001, Betty filed a petition seeking a divorce under La. C.C. art. 102, alleging that she was free of fault in the breakup of the marriage and requesting both interim and final periodic spousal support. On April 10, 2001, the court signed a judgment on matters incidental to the divorce which, among other things, awarded Betty monthly interim spousal support in an amount equal to the mortgage note on the former matrimonial domicile, or approximately $538.00.
On October 1, 2001, Kurt moved to have the trial court order Betty to show cause why the divorce should not be made final. In response, Betty filed an answer and reconventional demand requesting that the court set final periodic spousal support. A judgment granting the divorce was rendered on November 8, 2001. On April 30, 2003, a hearing was held to determine fault and final spousal support. At the conclusion of the hearing, the trial court took the matter under advisement. The court rendered judgment, with reasons, finding Betty free from fault in the breakup of the marriage and awarding her final periodic spousal support in the amount of $600.00 per month. Kurt appealed the judgment.

DISCUSSION
Kurt argues that the trial court erred in imputing Betty with earning potential of $350.00 per month when the evidence showed that she was earning more than that at the time of trial, and that the trial court compounded that error by failing to consider the imputed income in calculating the amount of support it *467 ultimately awarded Betty. Both of these arguments are without merit.
At the time of trial, Betty was 65 years old and had suffered from and had surgery for carpel tunnel syndrome in both hands. She had also suffered from breast cancer in 1998, for which she underwent a mastectomy. In November of 2002, Betty was diagnosed with rheumatoid arthritis in her hands and feet. While she spent most of the marriage caring for the needs of her disabled husband, she did work part-time at Hallmark stocking cards. At the time of trial, Betty was still employed by Hallmark, but had provided her notice of resignation effective May 2, 2003. Betty's decision to retire was due to her continuing health problems, especially the recent arthritis diagnosis. She testified that she had tried to retire several months earlier, but stayed on while a co-worker recovered from hip surgery.
Betty's W-2s for the years 2000, 2001, and 2002 showed that she had an average gross monthly income of $537.16 in 2000, $825.48 in 2001, and $1,055.21 in 2002. Betty explained that the increase in income was a result of her working more hours than she did during the marriage. She testified that she was required to take on the additional work to make ends meet. Nevertheless, the trial court found that Betty would be unable to continue her employment with Hallmark due to her age and ongoing health problems and, thus, declined to attribute her with the income she had been earning from that employment. The trial court did find, however, that she should be able to maintain some form of part-time employment and imputed income to her in the amount of $350.00 per month.
Once freedom of fault is established, the basic tests for the amount of spousal support are the needs of that spouse and the ability of the other spouse to pay. La. C.C. arts. 111, 112; Carr v. Carr, 33,167 (La.App.2d Cir.4/5/00), 756 So.2d 639. La. C.C. art. 112 requires the court to consider all relevant factors in determining an award for final periodic spousal support. The nine factors listed in the article, while not exclusive, are as follows:
(1) The needs of the parties.
(2) The income and means of the parties, including the liquidity of such means.
(3) The financial obligations of the parties.
(4) The earning capacity of the parties.
(5) The effect of custody of children upon a party's earning capacity.
(6) The time necessary for the claimant to acquire appropriate education, training, or employment.
(7) The health and age of the parties.
(8) The duration of the marriage.
(9) The tax consequences to either or both parties.
The trial court is vested with great discretion in making post-divorce alimony determinations, and its judgment will not be disturbed absent a manifest abuse of discretion. Carr, supra.
It is axiomatic that in determining a spouse's earning capacity, one of the enumerated factors in La. C.C. art. 112, the court must look to that spouse's age, health, education, and employment experience. After reviewing the entire record and considering the totality of the circumstances, we do not find that the trial court erred in finding that Betty would be unable to continue to earn an income at the same level she had in the three preceding years. Betty was 65 (an age when most people are retiring) and suffered from numerous health problems, described in the testimony of both Betty and her daughter. *468 Her health problems were further confirmed by documentation of the numerous prescription medications Betty was required to take. Continuing the repetitive work associated with her job re-stocking greeting cards for Hallmark would be detrimental to Betty's physical welfare. Accordingly, it was not an abuse of the trial court's discretion to impute Betty with an average monthly income of $350.00 per month on the basis that she could find some form of part-time work which would not aggravate her health problems.
Kurt's contention that the trial court failed to include this $350.00 in Betty's monthly income when calculating the award of final support is without merit. The trial court found that Betty's allowable expenses amounted to $1,816.00 per month. In adding $350.00 per month to Betty's monthly social security income of $905, the trial court would have arrived at a total monthly income of $1,255.00, which is $561.00 less than Betty's monthly expenses. There is no rigid formula by which a final support award is to be made, and we do not find that the award of $600.00 per month was an abuse of the trial court's discretion.
Kurt further argues that the trial court erred in awarding Betty final periodic support when her inability to financially provide for herself is due in part to her imprudent depletion of assets. Specifically, Kurt relies on evidence regarding two events: first, Betty's withdrawal of $20,000.00 from a community account just after the parties' separation and, second, Betty's receipt of $26,000.00 from the sale of a home. Betty testified that some of these funds were donated to her children and her church, and to purchase a vehicle and a home. Kurt argues that the sums donated to her children and church to the detriment of her ability to support herself should preclude her from receiving alimony.
The evidence shows that Betty withdrew $20,000.00 from a community account prior to the parties' physical separation in December of 2000. She then donated $5,000.00 apiece to each of her two children,[1] put $5,000.00 down on the purchase of a Saturn automobile, used some funds to retain an attorney, and gave money to her church.
The evidence also shows that the parties had a community interest in a home located on Booth Drive, with a monthly mortgage note of $538.00. Kurt deeded the property to Betty, who sold it and received approximately $18,000.00 in proceeds. Betty then purchased a cabin on Camp Joy for $22,000.00, for which she made a down payment of $16,000.00 and borrowed an additional $6,000.00. Betty eventually sold the Camp Joy cabin for $26,000.00. The record is unclear as to what her payoff on the Camp Joy cabin was. She then made a down payment of $4,000.00 toward the purchase of a new home on Wells Island and financed approximately $30,000.00 of the purchase price. Her current monthly note on the Wells Island home is $301.00, approximately $235.00 less than the mortgage note on the matrimonial domicile.
A spouse claiming support is required to deplete her liquid assets to some extent before she may be entitled to post-divorce support. Patton v. Patton, 37,401 (La.App.2d Cir.9/24/03), 856 So.2d 56. In determining the extent of any depletion of assets, the court must apply a rule of reasonableness in light of factors such as *469 the value and liquidity of the assets, ages and health of the parties and their relative ability, education, and work experience. Id. The court must be cautious of the probable long-term effects when contemplating depletion of assets. Id.
The evidence supports the trial court's conclusions that the disposition of assets complained of by Kurt was not unreasonable and that Betty should not be required to deplete her remaining liquid assets before being awarded final support. Betty's use of community funds to replace her vehicle, retain an attorney, and donate money to her children and church was not unreasonable. Betty testified that she put $5,000.00 down on the purchase of an automobile to replace the inoperable vehicle with which she had been left. She then donated a total of $10,000.00 to her children ($5,000 each). She used part of the remainder to retain an attorney, an expense which became necessary as a result of Kurt's actions. As noted by the trial court, one might question whether Betty was the best manager of her money, but the evidence does not support the conclusion that she "squandered" her funds or that her dispositions were made in bad faith.
The record is unclear as to the exact amount of money Betty was left with after the series of transactions that began with the sale of the matrimonial home and ended with her purchase of the Wells Island home. Viewed in a light most favorable to Kurt, Betty could have retained as much as $20,000.00. However, even assuming this to be the case, we find that the trial court did not err in finding that Betty should not be required to deplete these assets. Considering Betty's various medical complications and advancing age, she is likely to encounter various expenses which she will not be able to afford on her monthly social security income and final periodic support. Accordingly, we find this argument to be without merit.

DECREE
At appellant's costs, the judgment is AFFIRMED.
NOTES
[1] While no exact explanation is provided in the record, it appears that Betty had a son from a previous relationship.